THE STATE OF NEVADA, Respondent, *v.* HENRY A. RHOADES, Administrator of Eben B. Rhoades, Deceased, et als., Appellants.

Relevancy of Evidence Tending to Support Defense. On a trial against the sureties on the official bond of a State treasurer, to recover for defalcation claimed to have taken place within the period covered by the instrument, it is competent for defendant to show that the defalcation occurred previous to the giving of the bond, and any testimony tending to support such defense is relevant and pertinent.

Exclusion of Relevant Testimony Error. Where in an action against the sureties on the official bond of a State treasurer for defalcation, defendants' counsel asked a witness as to the condition of the treasury at a time previous to that covered by the bond; and upon objection, on the ground of irrelevancy, counsel stated that he proposed to show that the defalcation complained of took place before the bond was given, and that to show such fact it was necessary to show the condition of the treasury as asked : *Held*, that the exclusion of the question and proposed testimony was error.

Statement of Counsel to Show Relevancy of Testimony. Where a defendant asked a witness a question which, under the pleadings, appeared directed to proof of irrelevant matter ; and upon objection made on that ground, counsel stated the character of his defense ; and it appeared that the proposed defense was admissible, and the question one the answer to which might tend to support it: *Held*, that the proposed testimony was relevant, and the exclusion of the question error.

The State of Nevada *v*. Rhoades.

TEST OF ·RELEVANCY OF EVIDENCE.  To ascertain whether evidence be relevant or not, it is only necessary to determine whether it has a tendency to establish a legitimate case or defense relied on.

INTIMATIONS OF COURT EXCLUDING EVIDENCE.  Where a witness was called for the purpose of proving a certain fact; and the court, in ruling out a question in any way calculated to elicit testimony to establish it, informed counsel that proof of such fact would not be admitted: *Held*, that the action of the court was to be treated as a decision ruling out evidence of such fact, and that it was unnecessary for counsel to persist in efforts to prove it.

LIABILITY OF SURETIES ON BOND OF DE FACTO OFFICER.  Where a State treasurer, reëlected in 1866, accepted a new commission and took a new oath, and continued to discharge the duties of the office, but failed to file a new official bond within the time prescribed by law: *Held*, that he was an officer *de facto* and holding as of the new term; and that the sureties on the new bond afterwards filed were estopped from denying that he was holding as of the new term *de jure*.

SURRENDER OF FIRST TERM BY OFFICER RE-ELECTED.  Where an officer on being reëlected accepted a commission, and took the oath of office for the new term, and presented a bond therefor, which, however, was not approved, and he failed to present a new one in the time prescribed by law: *Held*, that he had relinquished all claim to continue to hold over under the former term.

OFFICERS DE FACTO.  A person discharging the duties of a public office under color of right, is an officer *de facto* and not a mere intruder.

LIABILITY .OF SURETIES OF DE FACTO OFFICERS—RECITALS IN OFFICIAL BONDS—ESTOPPEL.  Where a person discharges the duties of an office as an officer *de facto* and not as a mere intruder, he and his sureties are estopped by the recitals in his official bond from denying that he is entitled to the office.

OFFICIAL BOND FOR SUM GREATER THAN REQUIRED.  Where a State treasurer voluntarily gave an official bond in the sum of $102,500, while the law only required one in the sum of $100,000 : *Held*, that there was nothing in the law to prohibit the giving and the accepting (if voluntarily offered) of such a bond ; and that under the circumstances the excess did not invalidate it.

NO DOCKET FEE IN ACTION BY STATE.  The statute requiring the payment of a docket fee on the commencement of every action or proceeding in a district court, (Stats. 1864-5, 406) does not apply to actions commenced by the State.

EVIDENCE—ORAL RESULT OF EXAMINATION OF LONG ACCOUNTS.  Where it became material and relevant to know the amount of money which should have been in the State treasury on a certain day: *Held*, that it was competent, under Sec. 427 of the Practice Act, as well as under the law independent of it, for an expert, who had made a full investigation of the accounts of the office, to state orally the result of his examination.

EVIDENCE—BOOKS OF STATE TREASURER PUBLIC RECORDS.  In a suit against the sureties on the official bond of a State treasurer charged with defalcation : *Held*, that the entries in the books of the treasurer's office were competent evidence against the sureties without proof that they were made by or with the knowledge of the treasurer personally ; such books being official (Stats. 1866, 57) and coming under the head of public records.

APPEAL from the District Court of the Second Judicial District, Ormsby County.

This action was instituted in March, 1870, by the then Attorney General, and judgment rendered, in pursuance of the prayer of the complaint against the defendants, in November, 1870. These defendants consisted (in addition to the administrator of Eben Rhoades, deceased, the defaulting State Treasurer,) of the sureties on his official bond; and judgment was rendered against the administrator and such sureties, in sums as follows: John Gillig and A. K. Grim, $9,756.09; William Sharon and George F. Jones, $9,756.09; D. E. Avery and Joseph D. Winters, $9,756.09; George P. Howe and S. Steiner, administrator of Augustus Koneman, $9,756.09; James W. Haines and E. Mallory, $9,756.09; E. B. Rail and P. H. Clayton, $9,750.09; J. F. Goodman and O. S. Carville, $4,878.04; J. L. Black and A. S. Olin, $4,878.04; John Piper and C. Carpenter, $4,878.04; R. W. Perkins and C. N. Noteware, $4,878.04; Harriet Smith, administratrix of T. G. Smith, and H. M. Yerrington, $4,878.04; Horatio S. Mason and A. B. Driesbach, $4,878.04; Aaron D. Treadway and George L. Gibson, $4,878.04; John G. Fox, $4,078.04, and George T. Terry and David L. Hastings, $2,439.02.

*R. S. Mesick* and *Sunderland & Wood*, for Appellants.

I.   The District Court had no jurisdiction to try the case against the objection of defendants that no docket fee had been paid. (Const. Art. VI, Sec. 16; Stats. 1864–5, 406, Secs. 1, 2; *Brown* v. *Davis*, 1 Nev. 409; *Imperial Co.* v. *Barstow*, 5 Nev. 252.)

II.   The commission of E. Rhoades as treasurer and the bond should have been excluded. (Const. Art. XVII, Sec. 18; Art. V, Sec. 19; *Lytle* v. *Davies*, 2 Ohio, 277; *Olds* v. *State*, 6 Blackford, 91; *Com.* v. *Jackson*, 1 Leigh, 485; *Stewart* v. *Lee Gov.* 3 Call, 421; *U. S.* v. *Morgan*, 3 Wash. C. C. 10; *State* v. *Bartlett*, 30 Miss. [1 Geo.] 624; *Monteith* v. *Com.*, 15 Grattan, [Va.] 172; *Barnard* v. *Viele*, 21 Wend. 88.)

III.   The question put to witness Bostwick by plaintiff as to how much money his examination showed should have been in the

State treasury on the 10th of September, 1869, should not have been allowed.

IV.　The questions put to the witness Blasdel by the defendants should have been allowed and answers compelled. (Const. Art. V, Sec. 21 ; Stats. 1864–5, 135, Secs. 1, 2, 3.)

*Robert M. Clarke* and *A. C. Ellis*, for Respondent.

I.　It was not error to permit the expert Bostwick to give the result of his examination as to the amount of money which should have been in the treasury on September 10th, 1869. (1 Greenleaf Ev., Sec. 93 ; 1 Phil. on Ev., 433, 434, 454.)

II.　The question asked Gov. Blasdel as to the money in the treasury was properly denied, because it was immaterial how many times the board of examiners counted the money in the treasury ; the question was not directed to actual counts by the examiners, but to attempted counts by Blasdel.

III.　It was not error to deny the objection to proceeding with the cause for the nonpayment of the docket fee, because the statute requiring such payment is directory merely ; and besides this, the State is not required to pay the docket fee. (18 Johns, 227 ; 28 Miss. 763 ; 4 Cow. 143.)

IV.　It is no valid objection that the surety upon the bond is two thousand five hundred dollars more than is required by law, because the additional two thousand five hundred dollars is to the benefit of the sureties, and they cannot therefore complain. (6 Cal. 632 ; 19 Cal. 681 ; 21 Cal. 585.)

V.　Though Rhoades was only *de facto* treasurer, the sureties are estopped and the bond may be enforced. (8 Cal. 305 ; 22 Ark. 526 ; 14 Md. 369 ; 41 Miss. 234 ; 5 Ohio, 136 ; 17 Ill. 278 ; 36 Vt. 329 ; 17 Cal. 500 ; 15 Grattan, 172 ; 25 Ark. 108.)

By the Court, LEWIS, C. J. :

Eben Rhoades was elected as his own successor to the office of treasurer of the State of Nevada at the general election held in November, A. D. 1866 ; took the required oath of office at the prop-

er time ; received his commission, and tendered a bond for the approval of the Board of Examiners, in accordance with section two of an act entitled " An Act Defining the Duties of State Treasurer," (Statutes of 1866, 37) reading thus : " He shall be commissioned by the Governor, but before such commission shall issue, and before entering upon the duties of his office, he shall take the oath of office prescribed by law to be endorsed upon his commission, and shall execute and deliver to the Governor a bond payable to the State in the sum of one hundred thousand. dollars, with sureties to be approved by the board of examiners, conditioned upon the faithful performance of all the duties which may be required of him by law, and for the delivery to his successor in office of all books, papers, moneys, vouchers, securities, evidences of debt and effects belonging to his said office." By section twenty-two of an act entitled " An Act relating to Offices, &c." (Statutes of 1866, 233) he was required to file his bond at some time prior to the Tuesday after the first Monday in January succeeding his election. The board of examiners deeming the first bond tendered by him informal in some particular, refused to approve it. The informality was, however, subsequently remedied ; but it appears the bond thus amended was not approved by the examiners or filed by the treasurer until after the day designated by section twenty-two above referred to ; and the fifth subdivision of section thirty-five of that Act in terms declares that an office shall become vacant if the oath of office be not taken, or the bond required be not filed at the time so specified. The bond thus filed was given in the sum of one hundred and two thousand, five hundred dollars, with sureties liable in amounts ranging from twenty-five hundred dollars to ten thousand. The State, claiming that a defalcation had occurred in the office during the second term of the treasurer, brought this action on the bond mentioned above ; obtained a general verdict for one hundred thousand dollars against him and his sureties, upon which judgment was rendered against each surety for the sum for which he became liable. Defendants appeal.

After the plaintiff had closed its case, the defendant called the late Governor, who constituted one of the board of examiners, and whose duty it was to make a count of the money in the treasury at

stated periods, and propounded to him the question: " From January 1st, 1866 to the 10th of September, 1869, how many times did you, as a member of the board of examiners, attempt to count the money in the State treasury?" Plaintiff objected, on the ground of irrelevancy. Counsel for defendant stated " the object of the question with others to be asked the witness, was to show that the defalcation in question in this action occurred in the year 1866," a time prior, it will be observed, to the time when the bond in suit was given. The Court, however, sustained the objection. This question being ruled out, counsel then asked the following : " Did you, as a member of the State board of examiners, count the money in the State treasury in the year 1866 ?" This was likewise objected to upon the same grounds, and the objection sustained.; the Court saying, in making the ruling, that no inquiry as to any defalcation which occurred in the year 1866 was legitimate or proper in this case, and upon that ground refused to allow an answer to the question. Exception being duly taken, the ruling is here assigned as error ; and so we think it. Counsel for defendant, it will be seen, stated that the defense consisted in proof that the defalcation in question occurred prior to the time of the execution and filing of the bond in suit, and that the question was propounded with a view to establish that defense. That such defense was admissible under the pleadings is not questioned, for it was simply a disproval of the case made out for plaintiff, by the establishment of an affirmative fact inconsistent with it.

Now, the expert Bostwick had testified for plaintiff that his examination of the affairs of the treasury extended back to the beginning of the treasurer's first term of office, and the entire deficiency found by him was about one hundred and six thousand dollars. Although his examination appears to have been very thorough, he stated that he was not able to determine when the defalcation occurred, whether during the first or second term of the treasurer. So, also, that officer's chief clerk, who had occupied a position in the office during the entire time of the treasurer's administration, testified that he was likewise unable to ascertain that fact. There was very satisfactory evidence, it is true, going to show that it must have happened at some time subsequent to the twentieth day of Febru-

ary, A. D. 1869. But suppose the defendants were able to prove, as they proposed to do, that a defalcation to the extent here claimed existed as early as the year 1866 ; and to follow that up with proof that no money had after that time been paid into the treasury, except from the regular sources of revenue—in other words, establish a defalcation prior to the execution of the bond, and then account for all moneys afterwards received into and paid out of the treasury—would it not be strong evidence that the defalcation really occurred prior to the time claimed by the State, and to rebut the testimony fixing it at a time subsequent to the twentieth of February, A. D. 1869 ? Certainly it would. Whether the defense suggested could, as a matter of fact, be established, is of no consequence here. Counsel for defendants stated their intention to prove it by the witness on the stand. Certainly, they should have been allowed to do so by any unobjectionable evidence tending to make it out. Of course, the mere proof that a defalcation existed in the year 1866 would amount to nothing, unless it was followed up by proof that none other had occurred, or something equivalent, showing that the deficiency here sued for did not happen during the time covered by the bond. But to show that the defalcation in question occurred in the year 1866, it was first necessary to establish the fact that a deficiency actually existed in that year. The line of defense proposed to be taken by the defendants clearly could not be made out until that fact was proven. If this defense were in some way disclosed by the pleadings, and it was admitted to be good, surely it would not be claimed that the answers sought by the question asked the witness would be open to the objection of irrelevancy, for they were immediately directed to the elicitation of facts tending to make it out. So its relevancy was equally manifest from the statement of counsel showing the nature of the defense. This was the legitimate and proper course to pursue. A question is asked which, under the pleadings, would appear to be directed to proof of an irrelevant fact : objection being made, counsel then states the character of the defense. If the defense proposed be admissible and a question asked, answer to which may tend to bring out a fact bearing upon it, it should be allowed to be answered whether the defense in the case so re-

lied on be disclosed by the pleadings or the statement of counsel, as in this case. If the case or defense be sufficiently disclosed or stated to show the pertinency or relevancy of the evidence sought or offered, what more should be required? Surely there can be no object in requiring counsel to make a statement of his case under such circumstances, except to show the relevancy or competency of the particular evidence offered, and to enable the Court to rule intelligently upon its admission. If that be disclosed by a general statement of the case relied on, why is it not sufficient? A detailed statement of the several steps whereby a case is to be made out would be utterly useless, if a simple general statement as completely shows whether the evidence offered be relevant. The law does not require vain things. To ascertain whether evidence be relevant or not, it is only necessary to determine whether it has a tendency to establish the case or defense relied on. It cannot be expected that a whole case will be disclosed or made out at once. It is generally made up of distinct facts, the relevancy and force of one depending upon the proof of others; hence, it is often necessary to establish some facts by one witness or character of proof, and other by a different. If, therefore, evidence be offered in any way tending to prove or make out the case of the party offering it, it should be admitted. Whether it has such tendency is often easily determinable when the ultimate fact relied on as making out the case is known. When not sufficiently disclosed by the pleadings, the statement of counsel as to what that may be must necessarily be received. Such is the practice very generally sanctioned by the Courts.

Thus, in the case of *Palmer* v. *McCafferty*, 15 Cal. 334, which was an action of ejectment with a complaint in the usual form, the plaintiff offered a certain contract in evidence, counsel stating at the time that he intended to prove in connection with it that the defendant entered into possession of the premises and claimed under it. Objection was made that the contract was irrelevant; which being sustained, an appeal was taken. At the time the contract was offered it was certainly not relevant to any fact then proven, and could only become so upon the assumption that counsel would establish the facts which he stated he intended to. What is said by the

learned Judge delivering the opinion of the Court upon this question, is so entirely pertinent here that we may adopt it as clearly expressive of our own views. He says : " The plaintiff was entitled to introduce his proof in his own order. He was not bound to make his whole case complete by any one item of proof: A case consists frequently of various facts, neither one of which makes it out ; and to hold that a party is not entitled to introduce any part until he establishes the whole, is to require an impossibility. All that the Court can ask is that the particular evidence offered conduces to establish any one proposition involved in the issue. It is time enough to pass upon the sufficiency of the proofs after they are all in the cause. There must be a starting place somewhere, and the Court should never reject, merely because unaided by other testimony it is insufficient, if it tend legally to prove any part of the case" : and the judgment was reversed.

Say the Supreme Court of Illinois, in *Rogers* v. *Brent*, 5 Gil. 587 : " Most cases have to be proved by evidence of distinct facts neither of which standing alone would amount to anything, while all taken together form a connected chain and establish the issue ; and from necessity a party must be allowed to prove his case in such detached parts as the nature of his evidence requires. It would be no less absurd than inconvenient, where proof is offered in its proper order of one necessary fact, to require the party to go on and offer to prove at the same time all the other necessary facts to make out the case. * * * It is the right of the party when he offers evidence in its proper order, which proves or tends to prove any necessary fact in the case, to have it go to the jury ; for the reasonable presumption is that it will be followed by such other proof as is necessary for its proper connection ; and if it is not, it then becomes irrelevant, and as such, if desired, may be withdrawn from the jury. If there is anything to induce the suspicion that the time of the Court is being trifled with, it may be proper to call upon counsel to state the connection which they expect to give the proposed evidence; but that should ordinarily be avoided, as it is often embarrassing for counsel to anticipate their case in the presence of the opposite party."

Clearly, when it is stated by counsel that he intends to prove a

certain ultimate fact which, if proven, makes out his case, any evidence tending to establish that fact must be relevant; and if it can be seen that it has such tendency at the time it is offered, it is admissible.    Here it was proposed as a defence to locate the defalcature in question, in the year 1866.    If that were done, it is admitted it would be a complete defense.    And it is perfectly apparent the questions put to the witness Blasdel were pointed directly to the ascertainment of the financial state of the treasury in that year. The immediate answer to the questions would not probably disclose the fact whether a defalcation existed at that time or not, but they were necessarily preliminary to other questions put for that purpose. It would not be good practice to put the direct question whether a defalcation existed, until it were first known whether the witness had some means of knowing the fact and by what means he ascertained it.    But if it be said the questions ruled out did not have a tendency to elicit evidence directly tending to establish the defense, and therefore that counsel should have gone further and asked questions or offered evidence tending directly to that end, then it may be answered, the Court rendered that unnecessary by the ruling or decision that no inquiry as to any defalcation which occurred in the year 1866 was legitimate or proper, and ruling out upon that ground the questions propounded to the witness.    When a witness is called for the purpose of proving a certain fact, and the Court in ruling out evidence not in itself irrelevant going to establish it decides or informs counsel that proof of such fact will not be admitted, or that it will not be legitimate or proper to make such proof, can it be claimed that counsel must persist in efforts to prove it?    Such attempt would generally be deemed rather disrespectful to the Court making the decision, for it could only be made in direct disregard of its ruling.    Suppose a witness be put on the stand, and the Court directly informs counsel that proof of the fact offered to be proven by him will not be allowed.    Can not counsel stop right there?    Nay, would he not be compelled to; and would not the action of the Court be treated as a decision ruling out evidence of the fact so intended to be proven?    We are satisfied it would, and that such is the proper practice.    That is virtually this case. The witness was called, and a statement made by the counsel that

he intended to prove by him that this defalcation occurred in the year 1866, and the Court informed counsel that proof of a certain fact necessary to the making out of that defense would not be legitimate or proper. That, with the ruling accompanying it, was virtually a decision that such proof would not be allowed. Exception was then taken and no further proof was offered as it was manifestly useless, if it were not allowable to prove that fact; for without it the defense could not be made out. Can it be contended that after the ruling so made, and being informed that proof of an indispensable fact would not be legitimate or proper, the defendants should, notwithstanding, persist in an effort to introduce such proof? We think not. A rule should not be established or countenanced requiring counsel to disregard the decisions of the Courts made against them during the progress of a trial.

We are aware that in the case of *Baker* vs. *Preston*, 1 Gilmer, 135, it was held that the entries in the books of a State treasurer were conclusive upon him and his sureties, to the extent that they would not be allowed to show that any sum, which was shown by them ought to be in the treasury at any given time, was not there. This very singular decision is not relied on by counsel for the State, (although sustaining the ruling of the Court below on this point) perhaps for the reason that they do not consider it law. And surely, were it not for the distinguished ability of the Judge to whom the opinion is attributed, it would not deserve a moment's consideration. That it was rendered by Judge Roane is the only merit which it is possible to discover in it. The fallacy of the position taken by the majority of the Court was very clearly shown by Judge White, in a dissenting opinion of unanswerable logic and crushing force. Little, if anything, can be added to what was said by him in opposition to the conclusion of his associates. Neither has the decision been considered law, if not directly overruled, even in Virginia. Its authority seems to have been questioned in *Mumford et als.* v. *Overseers of the Poor of Nottoway*, 2 Randolph, 213; and Judge Tucker, in *Craddock* v. *Turner's Admr.*, 6 Leigh, 124, said that it had not been very acceptable to the profession, and that "It was most ably combatted at the time by one of the most distinguished judges of the General Court then sitting as

a member of the Special Court of Appeals which decided the case."
The case, indeed, stands alone, and is at variance with all the cases
we have been able to consult, both American and English.   We can-
not, therefore, rely upon it as authority here.

In its ruling upon this point the Court below erred, and conse-
quently the verdict and judgment must be reversed.    There are
other important questions raised and fully argued here, which as they
involve the validity of the bond in suit, and the competency of cer-
tain evidence, without which the plaintiff will be unable to make
out its case, will doubtless be again made in the next trial, if not
now passed upon.    In justice, therefore, to the parties, they should
be disposed of at present; and this we propose to do.

First, it is argued that as the bond was not executed or filed
prior to the Tuesday after the first Monday in January, A.D. 1867,
succeeding the election, the treasurer's right to the office was for-
feited by force of the statute above referred to; and consequently that
the bond was simply voluntary and not binding on the obligor or his
sureties.   In other words, that the term of office for which the bond
was given having been forfeited, Rhoades could not and did not
hold it by virtue of his second election, but held under the con-
stitutional provision authorizing him to hold over until the quali-
fication of his successor.    Not being able to enter upon the term
for which the bond was given; it was executed and received by the
examiners without authority.    In answer to this position assumed
by the learned counsel, it will be endeavoured to maintain these
propositions.    1st. That Rhoades relinquished all right to hold
office by virtue of his first election.    2d. That afterwards he was
an officer *de facto* under the election of 1866.    3d. Being an officer
*de facto*, he and his sureties are estopped from denying that the
bond was legally given; or rather that, so far as the officer and his
sureties are concerned, he is to be held an officer *de jure*.

Was all claim to the office under the first term relinquished?
Certainly, so far as he could do so, Rhoades abandoned all right to
hold under his first election.   A commission was issued to and
accepted by him evidencing his second election; he took the oath
of office as required previous to entering upon the discharge of the
duties of the second term, and actually presented a bond to the

board of examiners for approval within the time required of him, which seems only to have been rejected by the board because not in the form prescribed by them; and afterwards had it amended so as to obviate the objection; and that was afterwards actually approved and filed. Nothing can be clearer than that the treasurer relinquished his first term and claimed to hold the office by virtue of his election in the year 1866. So far, then, as he could surrender the office under the first election, he did so. Furthermore, it is stated in the bond itself that it is executed for the purpose of enabling him to enter upon the office under that election. It cannot very well be said that he continued in office under his first election and qualification, when it is shown that he did all he possibly could to surrender it. That he had the right to relinquish it as he had the right to resign at any time, it seems to us, will not admit of question. This is the same as if he was succeeded by a third person. The law does not recognize the person filling the office, but only the term. So every term of office is in contemplation of law filled by a different person; hence, if it be the same person still, all the acts of qualifications are required of him which are required of a stranger.

2d. These facts, which show the purpose of Rhoades to relinquish the office, accomplish more—they made him an officer *de facto* under his second election. It is admitted he was elected, that he took the oath of office, and was commissioned by the proper authority; thus leaving nothing to be done to make him an officer *de jure* except the filing of the bond prior to the Tuesday after the first Monday in January. These acts give him color of right. It has been frequently held, and may now be taken to be the settled law, that a person discharging the duties of a public officer, under color of right, is an officer *de facto*, and not a mere intruder. " Such an officer," say the Supreme Court of Connecticut, *Plymouth* v. *Painter*, " is one who executes the duties of an office under color of an appointment or election to that office. He differs on the one hand from a mere usurper of an office who undertakes to act as an officer without any color of right, and on the other from an officer *de jure*, who is in all respects legally appointed and qualified to exercise the office." That was a case where a person who had

been duly elected grand juror for the following year failed for some time to take the oath required, was fined for this neglect, paid the fine, and subsequently took the oath and entered upon the discharge of his duties.    It was claimed that the failure to take the oath at the proper time vacated the office, and consequently that his acts as grand juror were void.    The Court, however, held that he was an officer *de facto*, and that acts performed by him were legal; saying: " He was plainly more than a mere usurper; he was legally appointed by the town to the office, and was eligible to such appointment; and claiming a right to act under it, took in due form the oath prescribed by law for the office.    There would confessedly be sufficient to confer on him a perfect legal title to the office, but for what intervened between the appointment and the taking of the oath.    Whatever may be the effect of what thus intervened upon the question whether he could afterwards rightfully become qualified for the office by taking the oath, it is clear that the administration of it, in connection with his previous appointment, gave him at least a color, pretence, or show of right to exercise the office, which is all that is necessary in order to constitute him an officer *de facto*. Even if his previous refusal to take the oath legally disqualified him from subsequently doing so, this effect was not so palpable and obvious as to deprive him of a fair color of right to exercise the office. There was an observance of all legal forms requisite to enable him to act as such officer, and they clearly constituted a colorable title or apparent right.    (17 Conn. 587.)    In *Pier Co.* v. *Hannam*, 3 Barn. & Ald. 266, it was claimed that certain acts of one Dyson, as justice of the peace for the liberties of the Cinque Ports, were invalid, because he had neglected to comply with an act of parliament which declared " that no person commissioned as justice of the peace should be authorized to act as such unless he shall have such qualifications as will authorize him to act for a county, and unless he shall have taken and subscribed the oaths and delivered in at some general session to be holden in some one of the Cinque Ports the certificate respectively required to be taken and subscribed and delivered in by persons qualifying themselves to act for counties."    Dyson had taken the oath required, but failed to deliver a certificate.    By the Court, Abbott, C. J.    " We are of

the opinion that, notwithstanding this omission, his acts as a justice, in the matter in question, were valid."

In *Bucknom* v. *Ruggles* (17 Mass.) a deputy sheriff, although regularly commissioned by the sheriff, neglected to subscribe the declaration and oaths prescribed by the constitution and laws of the commonwealth to qualify him for the execution of the duties of his office. The validity of his acts being in question, the Court say : " This is an extremely plain case, and depends on principles perfectly well settled. The deputy having received a regular appointment from the sheriff, was an officer *de facto*, notwithstanding his neglect to comply with the provisions of the constitution."

The case of the *People* v. *Collins*, 7 John, 549, arose upon these facts. A person was elected a commissioner of the highways for the year following. The law provided that before entering on the discharge of his duties, and within fifteen days after his election, he should take and subscribe the oath of office before some justice of the peace, who, within eight days thereafter, should certify and deliver it to the town clerk ; and that if he should not take and subscribe such oath, the neglect should be deemed a refusal to serve in such office. The commissioner alluded to neglected to take the oath thus required ; and when he afterwards laid out a survey of a road, the town clerk refused to record it. Upon an application for mandamus to compel the recording, it was claimed that the failure to take the oath within the time designated by statute, vacated the office ; but by the Court: " Nor is the allegation material in this case, that the commissioners had not caused a certificate of oath of office to be filed in the town clerk's office. If the commissioners of highways acted without taking the oath required by law, they were liable to a penalty ; or the town, upon their default in complying with the requisition of the statute, might have proceeded to a new choice of commissioners. But if the town did not, (and it does not appear that they did in this case) the subsequent acts of the commissioners, as such, were valid, as far as the rights of third persons and the public are concerned in them. They were commissioners *de facto*, since they came to their office by color of title." *Monteith* v. *The Commonwealth*, 15 Grattan, 172, was an action on the official bond of a sheriff, who was elected to suc-

ceed himself, and failed to qualify within the time prescribed by law. The statute made it the duty of the defendant in that case, before entering upon the discharge of his duties, to take an oath of office and give such official bond as might be required of him by the County Court, within sixty days after his election ; and it further provided, that in case of a failure in these particulars the office should be deemed vacant. Monteith failed to execute the bond required of him, within the sixty days succeeding his election. Upon suit being brought upon the bond given by him, after the time designated by law, the question among others was made, whether Monteith, who continued to discharge the duties of the office, was an officer *de facto*. Say the Court of Appeals: " Was not Monteith after he gave bond and entered upon the discharge of the duties of the office, sheriff *de facto ?* If he were not in all respects an officer *de jure*, because of the failure to qualify and give bond in the time prescribed, was he a mere usurper, undertaking to act without any pretence or color of right ? This cannot be maintained upon the facts in the record. He had been regularly elected ; from that election he derived his title to the office ; no commission was necessary to perfect it ; the law required none, and in practice no commission issues. The subsequent steps of the officers conducting the election are only intended to authenticate the fact of such election, and the qualification and bond do not confer the office, but are preliminaries to his entering upon the discharge of the duties of the office to which he has been elected. Asserting such title to the office, he executed and acknowledged the bond required by law before the tribunal authorized to take the official bond of sheriffs. The condition of the bond so executed recites that he hath been elected sheriff of the County of Stafford for the term of two years, commencing from the first of January, 1857, and binds him to the faithful discharge of the duties of his office aforesaid, according to law, thus showing that he claimed to act under the title conferred on him by election, and gave bonds to execute the duties of the office, to which he asserted a legal right." Upon these facts the Court held the sheriff to be a *de facto* officer. Certainly, that case is no stronger upon the law or facts in favor of the conclusions arrived at by the Court than this.

Being an officer *de facto* and not a mere intruder or usurper, he and his sureties are estopped by the recitals in the bond to deny that Rhoades was entitled to the office, although it would be otherwise if he were a mere intruder. This bond contains this recital: "Whereas, at a general election held in the State of Nevada, on the sixth day of November, in the year of our Lord one thousand eight hundred and sixty-six, Eben Rhoades was duly elected to the office of treasurer of the State of Nevada for the term of two years from the first Tuesday after the first Monday of January, A. D. 1867, and whereas, the said Eben Rhoades is required by law to file an official bond in the general sum of one hundred thousand dollars previous to entering upon the duties of said office"; and concludes in the ordinary form. Now, can the obligor or his sureties rely upon the defense that at the time this bond was given the office had been forfeited, and that Rhoades could not legally enter upon the duties thereof under the election by virtue of which he claimed the right to enter? We think not. Rhoades was claiming the office by virtue of his election in 1866; had taken the oath preparatory to entering upon it; and the sureties also by the recitals in the bond in effect assert his right thereto. This estops them now from asserting the contrary. Here also the authorities are numerous, and we find many almost identical with this case so far as this point is concerned. Thus, in the case of *Monteith* v. *The Commonwealth,* referred to above, the Court held that the sureties on the sheriff's bond, although given after the time limited by the statute, were estopped to deny that the sheriff was entitled to the office as of right, and the action on the bond maintained; although it appears to have been conceded that the obligor forfeited his position as an officer *de jure* by the failure to file the bond within the proper time; the Court saying: "If the sheriff is an officer *de facto,* it is not for him to deny the validity of his title, or to say that he is not sheriff *de jure,* or that the Court had no authority to take his bond. When the Court recognized the validity of his title, whether they erred or not, they were acting within their jurisdiction in requiring the bond; for the law makes it the duty of the Court to take such bond from the sheriffs elected. The title by election so recognized subsists until the party is ousted, and while

it does exist the Court may rightfully require the bond. Whenever it is conceded that he is an officer *de facto*, it is also conceded that the office is full.   He cannot deny that he is sheriff *de jure* : and concede him to be an officer, the law makes it the duty of the Court to require bond.   In this case there is no question that the bond is in proper form, taken by the proper tribunal, and that it was given by him as sheriff for a specified term for which he was elected. It would be most unjust to the public and to individuals who must rely on this bond as their security for the due performance of the duties of his office, to permit him now to controvert the truth of his own assertions.   Nor can I perceive any better ground upon which the sureties can stand.   If the bond is valid as to him, it is equally so as to them.   The fact of election is proven by the recital in the condition, and admitted in the agreement of facts.   And the recital shows the bond was taken and received by virtue of such title ; and this it seems to me they are estopped from denying, even if the agreement of facts did not show the election."

We have quoted thus at large from the opinion of the learned Judge, because almost every sentence seems apt and pertinent to this case, and the conclusion arrived at by the Court in that is a clear authority in favor of the validity of the bond here sued on.

The Supreme Court of Vermont, held in the case of the *State* v. *Bates et als.*, 36 Vt. 387, which like this was an action on the bond of the State treasurer, that although the officer had failed to qualify as required by the constitution, and consequently only held the office as an officer *de facto*, his sureties were holden as if he were an officer *de jure*.   See also *Town of Linden* v. *Miller*, Id. 329.   The Supreme Court of Illinois, in *Green* v. *Wardwell*, 17 Ill. 280, say upon this head : " The other question is, if possible, attended with less difficulty.   The public is not bound to inquire into all the technical questions which may affect the right of the officer to the office which he holds.   Although he may have been elected by illegal votes, or may have been ineligible to the office ; although the great seal of State may not have been impressed upon his commission ; or although even no commission at all may have been issued to him ; or although he may never have taken an official oath ; or although he may have been elected to the Legislature, which is an office incom-

patible with that of justice of the peace; still, so long as he continued to discharge the duties of a justice of the peace, and held himself out to the world as such, his official acts were binding, not only upon suitors but also upon his sureties, and they continued bound upon their obligation.   By signing his bond they acknowledged his right to the office and to discharge its duties, and as such recommended him to the public.   They, at least, shall not be heard to say, that although they signed his bond, and thereby induced others to put money in his hands, relying on their bond for its safety, still he was not elected, was not commissioned, was not sworn; that he was not, in fact, a justice.   If he had ceased to be a justice, the plea should have shown how he had ceased, so that the Court, seeing the facts, could determine as a matter of law whether or not he was still a justice.   While he acted as such, and as such collected this money, he must be regarded as an officer *de facto*, although, as the plea states, he had been elected to another office, which, in point of law, rendered him ineligible to the office of justice of the peace."

To the same point *Marshal* v. *Hamilton*, 41 Miss. 229. , *Morris* v. *The State*, 22 Ark. 524, was an action on a sheriff's bond, the defense being made by the sureties that the sheriff had vacated his office by not filing a bond as required, and consequently that they were not holden; but say the Court: " By the condition of their bond the defendants acknowledged that Morris was sheriff of Ashley County on the twenty-third day of February, A. D. 1856, and the law will presume him to have continued such till October, 1856, two years from the time for his qualification in 1854.   To admit the defendants to insist that Norris vacated his office by not giving bond till the date of their bond, would be to allow them to deny what their own acknowledgment under their hands and seals estop them from denying."

In the *People* v. *Jenkins*, 17 Cal., the same rule was applied to a case where the sureties on the bond of a county assessor sought to avoid responsibility on the ground that the assessor's election was absolutely void.   The Court disposed of the defense in this manner: " The principal obligor and his sureties are in no condition to question the regularity of the election of the principal, or

his responsibility for acts done in an official capacity. The principal had at least the ' color of office by his appointment, and the bond estops him and his sureties signing it from denying his official character.' " These authorities are squarely opposed to the ground taken here, that the failure to execute the bond within the statutory time released the sureties. They have precluded themselves from saying that the person, for the faithful discharge of whose official acts they became sureties, was not of right entitled to perform such acts. The authorities cited on behalf of defendants are not adverse to this conclusion. It will be found upon examination, either that the person for whom the bond was given was a mere intruder, not deemed an officer *de facto*, and consequently not estopped from showing that he was not an officer either in fact or of right; or where the bond was given under circumstances rendering it utterly null, but still free from all elements estopping the parties to it from showing such to be the case. Bonds like this are sustained upon a strong current of authorities holding that a person being an officer *de facto* is not permitted to show or rely upon the fact that he was not an officer *de jure*, for the purpose of attacking or setting aside anything which he may have done in his official capacity. And upon like reason his sureties are also estopped. Where there is no element of estoppel, or the reason for the rule does not exist, of course it should not be applied. The absence of the circumstances constituting an estoppel is the distinguishing feature between the cases cited for the defendants and those sustaining the conclusion at which we have arrived.

The second objection to the validity of this bond is that it is given for the sum of one hundred and two thousand, five hundred dollars, whereas the statute only requires a bond for one hundred thousand. It is not claimed that the board of examiners in any way required the treasurer to give a bond in a sum greater than the law required. Giving it in excess of the sum fixed by statute was purely a voluntary act on the part of the obligor and his sureties. The law required a bond in the penal sum of one hundred thousand— they chose to give one for a sum twenty-five hundred dollars in excess of that required. Now, upon what legal principle can it be claimed that because these persons voluntarily chose to give the State

a larger security than it demanded, they are not holden even for the amount in which the bond was required to be given? The fixing of the amount in which the bond shall be given is very clearly for the protection of the treasurer—to guard him against the requirement of excessive security; but there is nothing in the statute in any wise prohibiting him from giving or the examiners from accepting a greater, should the treasurer voluntarily choose to offer it. It seems to us the State is fully as free to accept and the treasurer to give, if he choose to do so, a bond in a sum over one hundred thousand dollars, as if there were no limitation whatever in the statute. If the fixing of the penalty of the bond be for the benefit of the treasurer, he can waive it, and did so in this case, by voluntarily offering one in a penalty exceeding that required. Will it be claimed that an undertaking on appeal, or in attachment, if given for a greater sum than the statute requires, will be invalidated? Certainly, we think not. It would at once be suggested that it was a matter resting entirely with the person executing the undertaking to give it for a greater sum than the law made it incumbent upon him to give. Surely, it would be a novel proceeding on the part of an officer to refuse a bond in the statutory proceeding for the claim and delivery of personal property, or in attachment where the defendant claims a return of the property, upon the ground that it is given in treble instead of double the value of the property. A defense of that kind by the obligor or sureties on bonds of that character would not be listened to for a moment. But why more so, when made to a bond of this kind? There is no apparent legal reason why the rule applicable in the one case should not be equally so in the other. The first case relied on by the learned counsel for appellant as opposed to this view is *United States* v. *Morgan,* 3 Washington C. C. R. 10, in which there were several particulars in which the bond did not conform to the statute: among others, it is true,'the Court say that if taken for a greater sum than the law required, it might avoid it. There are, however, many distinguishing features between that case and this; but it is only necessary to mention one, which is that here the making of the penalty more than the statute required was the voluntary act of the obligor and his sureties; but in the case re-

ferred to, it was admitted by both parties that the conditions and penalty of the bond were not voluntary on the part of the obligor. That the Judge delivering that opinion would not apply the law of that case to a bond where the departure from the statutory form or requirements is the voluntary act of the obligor, is manifest from the fact that subsequently, in the case of *Speake* v. *The United States*, 9 Cranch, 28, on a similar bond under the same statute he concurred in the opinion of the majority of the Court, wherein it was directly held that the taking of an embargo bond for a sum greater than the statute required did not invalidate it. The other case, that of *Stewart* v. *Lee*, 3 Cal. seems to favor the proposition that a statutory bond given for a greater sum than required by law would be void. The report of the case, however, is meager and unsatisfactory to such an extent that it can hardly be received as authority on this point. We conclude the bond is not vitiated by reason of being executed for a sum greater than the law required. The disposition of this point also disposes of the objection made to the introduction in evidence of the commission of Rhoades, for if he and his sureties could not deny that he was an officer *de jure*, the commission was a step in the proof that he was such, and consequently was admissible.

Upon the trial the defendants moved to dismiss the action, upon a showing that the docket fee had not been paid as required by Secs. 1 and 2, Statutes of 1864-5, 406, the first declaring that " At the time of the commencement of every civil action or other proceeding in the several district courts of this State, the plaintiff shall pay the clerk of the court in which said action shall be commenced the sum of five dollars in gold or silver coin," and the second section, that " No such action shall be deemed commenced, proceeding instituted, or appeal perfected, until the said fees shall be paid as aforesaid." The motion was denied, and the ruling is now assigned as error. But it is clear the Legislature never intended to include actions by the State in the sections referred to. The fee being a tax imposed solely for revenue, upon well settled rules of law the State could not be included unless expressly named. It is a rule of the common law, that generally the king is not in his royal character bound by statute in which there are not express

words binding him. Comyn's Digest, title Parliament, R. 8. There are it is true many exceptions to this rule, but it has been expressly held that he is not included in an act imposing a tax or duty, so Comyn tells us. Id. And that was directly held by the King's Bench in the case of the *King* v. *James Cook*, 3 Term R. 519 The case arose upon these facts. The statute 25, Geo. III, C. 50, f. 4, enacted that "for and in respect to every horse hired by the mile or stage to be used in traveling post, there shall be charged a duty of one and one-half pence for every mile such horse shall be hired to travel post"—and the fifteenth section declared that the postmaster shall ask, demand and receive of and from the person or persons hiring the same the sum of one and one-half pence per mile." It appeared that the defendant was a postmaster and innkeeper, and was duly licensed to let to hire, horses for the purpose of traveling post. A package addressed to the postmaster general was brought and delivered to him to be forwarded to London. The defendant, immediately on receiving the letter, forwarded the same by a man and horse to its destination. It appeared that the postmaster general paid the expenses of the post out of the revenue of the post-office, and that the defendant was allowed at the rate of 3 d per mile for carrying the package. The defendant, having failed to make an account of this hiring as the law required, he was convicted and fined. The King's Bench reversed the conviction; Lord Kenyon, in delivering the opinion of the Court, saying, after referring to the sections of the statutes above quoted: "Now, in this case who can said to be the person hiring the horse? The packet was sent for the use of Government, and it passed through the hands of the different postmasters, who forwarded the express in consequence of an official duty incumbent upon them. But they cannot be said to be the persons hiring the horses within the meaning of the act. My opinion proceeds on the ground that this was on the service of Government; and the case states in express terms that the packet contained a letter directed to one of the principal secretaries of State, and that it was not on any private business whatever, but wholly related to the public concerns of the kingdom. Now, although there is no special exemption of the king in this Act of Parliament, yet I am of opinion that he

is exempt by virtue of his prerogative in the same manner as he is virtually exempted from the 43d Eliz., and every other act imposing a duty or tax on the subjects.    And I understand that the horses carrying the mail were never deemed liable to post-horse duty." The common law upon this head is held to apply with equal force to the several States, and also to the Federal Government, as to the king in England.    Says Judge Story, in the *United States* v. *Hoar*, 2 Mason, 314:  " But independent of any doctrine founded on the notion of prerogative, the same construction of statutes of this sort ought to prevail founded upon the legislative intention.    Where the Government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed or the language used, that the Government itself was in contemplation 'of the Legislature, before a Court of law would be authorized to put such an interpretation upon any statute.    In general, acts of the Legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different and often contrary force to the Government itself.    It seems to me, therefore, to be a safe rule, founded in the principles of the common law, that the general words of a statute ought not to include the Government or affect its rights, unless that construction be clear and indispensable upon the text of the Act."    See also, *The People* v. *Gilbert*, 18 Johnson, 227. So, in accordance with this rule, it was held in the case of the *People* v. *Rossiter*, 4 Cowan, 143, that the State was not bound by the provisions of a Bankrupt Act, unless expressly named.    Certainly, there is nothing in the text of the Act referred to, except the mere generality of the words that the fee shall be paid at the " commencement of every civil action," from which it can be presumed the Legislature intended to include the State.    And a tax levied by the State upon itself, or its own transactions, is so anomalous that it cannot be supposed it was intended, unless upon the clearest language.    A more appropriate application of the rule of the common law could not be made, than to cases of this kind.    We conclude the statute does not include actions instituted by the State.

The objection made to the question propounded to the witness Bostwick is clearly untenable.    It was shown that his examination

of the affairs of the treasury extended over the entire period between the organization of the State and the time of the vacancy caused by the death of the obligor on the bond sued on. His preliminary examination certainly shows a very thorough investigation of the accounts of the office; after which the question, " What was the result of your examination as to the amount of money which should have been in the treasury on the tenth day of September, 1869," was entirely free from the objections interposed, namely, that it called for secondary evidence, and that the examination made by the witness was only partial. As to the first objection, the statute is a sufficient answer. Subdivision fifth of Sec. 427 of the Practice Act of 1869, expressly dispenses with written vouchers, or written documents, " when the original consists of numerous accounts or other documents which cannot be examined in Court without great loss of time, and the evidence sought from them is only the general result of the whole." Such also is the law independent of statutes. (1 Starkie on Evidence, 96.) The second objection is not borne out by the record. The examination of Mr. Bostwick preliminary to asking the question unmistakably shows, not a partial, but a full and complete investigation of the monetary transactions of the treasury during the entire period of Rhoades' incumbency.

Again, it is argued the Court erred in overruling defendants' objection to this question put to the treasurer's clerk : " What amount of money do the entries in the treasurer's books show ought to have been in the treasury on the tenth day of September, A. D. 1869"? The ground of this objection, as stated in the transcript, is " because the entries were not shown to have been made under or by the Treasurer Rhoades, or with his knowledge or in his life time." The statute laws of 1866, page 57, Sec. 4, make it the duty of the State treasurer to keep a just, true and correct account of all moneys received and disbursed by him; and thus the books kept by him in accordance with this statute would clearly come under the head of public records, of which Greenleaf (Ex. Vol. 1, Sec. 484) remarks: " These books, therefore, are recognized by law because they are required by law to be kept; because the entries in them are of public interest and notoriety,

and because they are made under the sanction of an oath of office, or at least under that of official duty.  *  *  When identified and shown to have come from the proper repository, they are received as evidence without further attestation." Public officers are always presumed regularly and duly to perform the duties imposed on them by law; therefore when books which the law requires them to keep are offered in evidence, all intendments are in their favor ; it is presumed the entries were regularly made at the proper time and in accordance with the facts—consequently, if any irregularity, mistake or fraud is claimed to have been committed, the burden of establishing it is on the party relying upon it.   (6 Duer, 512.) The treasurer's books very clearly come within the rule above stated, and hence the objection that it was not shown that the entries were made by or under the authority of the treasurer was entirely untenable, for it was not incumbent on the plaintiff to make any such showing, the law presuming such to be the case, if indeed it were at all essential that the entries should have been so made.   Manifestly, the objection was not maintainable upon the ground stated.

Judgment reversed and cause remanded.

GARBER, J., dissented.