JAMES VAN SICKEL, ET AL, PLAINTIFFS IN ERROR, V. THE COUNTY OF BUFFALO, DEFENDANT IN ERROR.

County Treasurer: LIABILITY OF SURETIES ON OFFICIAL BOND DEFENSE: EVIDENCE. A county treasurer who had been elected three successive terms proved to be a defaulter. Suit was brought by the county on his third bond. *Held,* 1. That 'the sureties might prove that the entire defalcation was committed before the giving of the bond sued on and before the commencement of the term of office covered by it, in which case they would not be liable. 2. That statements made by said treasurer to the board of commissioners of the amount of money on hand at the commencement of his 'third term of office were not conclusive upon the sureties, nor were they estopped from denying, impeaching, or contradicting the same.

ACTION on the bond of Van Sickel, county treasurer of Buffalo County. Judgment below before GASLIN, J., for the amount claimed, and the sureties brought the case here for review on a petition in error. The opinion states the facts.

*C. J. Dilworth, Hamer & Conner,* and *Sam. L. Savidge,* for plaintiffs in error, cited: *Vivan v. Otis,* .24 Wis., 518. *County of Mahaska v. Ingalls,* 16 Iowa, 81. *Bessinger v. Dickerson,* 20 Iowa, 261. *Warren Co. v. Warde,* 21 Iowa, 88. *Board of Supervisors of Jefferson Co. v. Jones,* 19 Wis., 61. *Rochester v. Randal,* 105 Mass., 295. *State v. Rhodes,* 6 Nev., 352. *Detroit v. Weber,* 29 Mich., 24. *Bissell v. Saxton,* 66 New York, 55. *Patterson v. Inhabitants,* 38 New Jersey Law, 256.

*E. C. Calkins,* with whom was *A. J. Poppleton,* for defendant in error, cited *Baker v. Preston,* 1 Gilmers (Va.), 235. *Morley v. Town of Metomora,* 78 Ill., 394. *Gage v. City of Chicago,* 2 Bradwell (Ill.), 332. *Patterson's Appeal,* 48 Pa. St., 345. *McCabe v. Rainey,* 32 Ind., 309. *Leavee v. Young,* 16 Vt., 658. *Charles v. Haskin,* 14 Ia., 471. *Townsend v. Everette,* 4 Ala., 607. *Cook v. State,* 13 Ind., 154. *Sandwich v. Fish,* 2 Gray (Mass.), 298. *Gen. Stat.,* 925, sec. 77.

COBB, J.

The controlling question in this case is presented as well by the instructions given in charge to the jury and those prayed by the defendants and refused, as by testimony offered by the defendants at the trial and excluded by the court.

The fourth instruction given at the request of the plaintiff below is as follows: "The jury are instructed that the several official statements made by the said defendant Van Sickel to the board of county commissioners of Buffalo county, of the amount of money on hand at the several dates thereof are binding and conclusive on all the defendants who signed and executed said bond. That said defendants are estopped from denying, impeaching, or contradicting the same; that the jury must find a verdict against said defendants for the amount appearing in said statements to have been in defendant Van Sickel's hands as treasurer, at the close of his term of office, which was not accounted for, and paid over to his successor in office, and in ascertaining said amount they must have recourse alone to the said official statements."

Van Sickel was elected county treasurer of Buffalo county for three consecutive terms, for each of which he gave bond. The bond upon which this suit was brought was his third and last. It bears date January 14, and was approved and

filed January 21, 1878. The condition of the bond is as follows: "The condition of the above obligation is: That whereas the above bound James Van Sickel was, on the sixth day of November, 1877, duly elected to the office of county treasurer in and for said county and state, for the term of two years from the date last above written and until his successor in office is duly elected and qualified, now if the said James Van Sickel shall render a true account of his office and his doings therein to the proper authority when required thereby or by law, and shall promptly pay over to the person or officer entitled thereto all money which may come into his hands by virtue of his said office; and shall faithfully account for all balances of money remaining in his hands at the termination of his office, and shall hereafter exercise all reasonable diligence and care in the preservation and lawful disposal of all money, books, papers, and securities or other property appertaining to his said office, and deliver them to his successor or to any other person authorized to receive the same; and if he shall faithfully and impartially, without fear, favor, fraud, or oppression, discharge all other duties now or hereafter required of his office by law, then this bond to be void," etc.

Upon the trial there was introduced and read as testimony on the part of the plaintiff a paper entitled, "Statement of county treasurer of funds collected and disbursed up to and including January 19, 1878." It is also endorsed as follows: "Examined and found correct this twenty-third day of January, 1878," signed by two of the county commissioners and attested by the county clerk. This paper contains a statement of the condition of the various funds in the county treasury on the first day of October, 1877, and of the receipts and disbursements of such fund up to January 19, 1878. Also a *resume* or summary of cash balance in the treasury, showing a total of $12,567.18, signed "J. Van Sickel," without date.

There was also introduced in evidence on the part of the

plaintiff the record of the proceedings of the board of county commissioners of said county under the date of Jan. 23d, 1878, as follows: "The board then proceeded to settle with the county treasurer, James Van Sickel, at the close of his term of office. Whereupon said treasurer presented his statement of accounts, which said statement was compared with the clerk's ledger and found to agree therewith. Said treasurer also presented his vouchers (as in said statement set forth), which vouchers were duly examined, counted, and after deducting the amount of said vouchers from the total amount of collections as found charged in the clerk's cash book and ledger against said treasurer, there was found to remain in the hands of the treasurer in the respective funds the amount of cash as in said statement shown.  *  *  *  *  Total cash in treasury, $1,267.18." There were also several other reports made by the said treasurer, and settlements between him and the county board; so that, quoting from the brief of plaintiff's attorney: " These reports were continued and showed that he had on hand, and was chargeable with, at the expiration of his office, $12,374.53 more than he turned over to his successor." So that the sum which he reported as in his hands at the commencement of the term for which the bond sued on was given and that for which he finally proved a defaulter are nearly identical.

The defendants below (the sureties) by their answer in several and various forms denied that the said Van Sickel made any default during the term for which they were sureties, alleged that said Van Sickel duly accounted for and paid over all the county funds which came into his hands for and during the term covered by the bond on which they were sureties, and that the said Van Sickel was a defaulter to the amount of twelve thousand five hundred sixty-seven dollars and eighteen cents at the close of his second term of office, and when he entered upon his third term and the giving of the said bond, etc.

On the trial the defendants—the bondsmen (Van Sickel having been defaulted for the want of an answer)—offered testimony to prove each of the above allegations of their answer, but such testimony was ruled out by the court.

But the whole question may be considered as turning upon the instruction above set out. Are the official statements or any statements made by the defendant Van Sickel to the county commissioners of the amount of county money in his hands at the several dates thereof binding and conclusive on all the defendants who executed said bond?

I do not doubt that it is within the power of the legislature to enact a law making it the duty of county treasurers to make official statements, and to make such statements conclusive evidence of the facts therein contained. But so far as I have been able to ascertain, no such statute has been passed, or had not at the date of the transactions here under consideration. I have not examined the revenue law of 1879. The only statute cited by the defendant in error as bearing on this point, and it doubtless was the only one then in force, is that found on page 925 General Statutes, section 77, which is as follows: "The county treasurer shall settle with the county commissioners on or before the first Monday of May, and on the first Monday of October. *Provided, however*, That the county commissioners may require the county treasurer to settle with them at any time. The treasurer is to be charged with the amount of all tax lists placed in his hands for collection, and credited with the amounts collected thereon and the delinquent lists; he shall leave his vouchers with the commissioners, to be retained by them for evidence of his settlement. If the treasurer's accounts are correct, the commissioners shall certify the same; if not, he shall be liable on his bonds."

I quote section 42, p. 239, Gen. Stats., as having a bearing on this subject: "The county clerk shall keep a distinct account with the treasurer of the county for each sev-

eral term for which the treasurer may be elected, in a book
to be provided for that purpose, commencing from the day
on which the treasurer shall assume the duties of his office
and continuing until the same or another person is quali-
fied as treasurer, in which account he shall charge the
treasurer with all sums paid him and for all sums for
which the said treasurer is accountable to the county, and
he shall credit him with all orders returned and canceled,
with all moneys paid, and with all vouchers presented by
him, and with all matters with which the treasurer is to be
credited in account."

I think that a proper consideration of these two sections
must lead to the conclusion that the measure of the ac-
countability of the county treasurer, nor of his bondsmen,
depends in the least degree upon any statement of such
treasurer, official or otherwise. Indeed, he is nowhere re-
quired to make any statement, nor do I find any authority
for dignifying any voluntary statement of his as official.
The first of the above-quoted sections requires the county
treasurers to settle with the county commissioners twice in
each year, and whenever the county commissioners may re-
quire, and it points out what such settlements shall be upon
—the tax list, the delinquent list, and the treasurer's
vouchers. No statement of the treasurer is given any
standing, official or otherwise, in these settlements. True,
the law speaks of the treasurer's accounts. But it clearly
refers to the actual state of his account. "If the treas-
urer's accounts are correct the commissioners shall certify
the same; if not, he shall be liable on his bonds." Does
this mean that if the treasurer makes out and presents a
statement showing a certain balance in his hands, whether
he has the funds to balance it or not, the county commis-
sioners shall certify the account as correct, and he shall not
be held on his bonds (or his bondsmen shall not be held),
but if he has not filled out a blank statement correctly his
bondsmen shall be held? I think not. But that it means

that the treasurer shall make a fair exhibit of the condition of his office upon the basis pointed out in the section, much as the cashier of a bank is required to exhibit the affairs of his bank—on the one side, the capital stock, the circulation, the deposits, etc.; on the other side, the bills receivable, exchange, etc., and *the cash to balance.*

But the statute nowhere makes these settlements conclusive. Nor do I think that it would be safe to do so. I know that in some cases, under somewhat different statutes, courts have held that treasurers, as well as their bondsmen, are estopped to deny the correctness of statements or reports made by treasurers to settling or auditing boards, etc. But it is of the essence of an estoppel that it be mutual. If the county treasurer and his bondsmen are estopped—in the language of the instruction—"from denying, impeaching, or contradicting" the correctness of such settlement, then the public authorities, present and future, are equally estopped. Would not the establishment of such a rule expose the public to great loss from the hasty, not always well-advised action of these boards, to say nothing of the premium it would offer to the crafty and unscrupulous, if it be true that such ever successfully aspire to official position?

Taking the two sections together, the law provides for keeping the accounts of the treasurer so that about all that the county commissioners have to do in these settlements, as it appears to me, is to examine the treasurer's vouchers and count the money on hand, and this is, or used to be, the all but universal custom.

While my examination of this case has brought me to the conclusion above indicated, it is not to be denied that there is an irreconcilable conflict of authority in the cases applicable to it, many cases holding that both principal and securities on an official bond are estopped to deny the statements, settlements, or books of the principal showing money in his hands at any specified time. But these cases, all of

them in fact and most of them professedly, follow the majority opinion in the case of *Baker* (*treasurer*), *for the Commonwealth, v. Preston and others,* 1 Virginia (Gilmer), 235. This case certainly does go to the full extent of holding that the report of a state treasurer of Virginia to the legislature of that state, which report was referred to a joint committee of the two houses of said legislature, and a report thereon made to the said two houses, and by them adopted, was conclusive both as to the treasurer and his securities. Also, that the books kept by the state treasurer, and the entries made therein by the treasurer and his clerks, were conclusive against the treasurer and his securities. While I consider this a much stronger case than the case at bar, yet it is an apt illustration of the saying among lawyers that "hard cases make bad precedents." It seems from a reading of this case, which is a very long one, extending over seventy pages of the printed report, that John Preston was, by the legislature of Virginia, elected to the office of state treasurer to serve for the term of one year, and until his successor should be elected and qualified, and he was annually re-elected for a similar term nine times in succession.. For the first nine years he gave no bond at all, but upon entering upon his tenth term he was required, by the provisions of the code then lately adopted, to give a bond, and he entered into one with sureties in the penal sum of one million dollars. Shortly after giving this bond, Preston executed a deed of trust to his bondsmen, nine in number, to indemnify them against loss as his sureties, of all of his property, supposed to be amply sufficient indemnity against the defalcation then supposed and afterwards known to exist. This deed was recorded in the hustings court of the city of Richmond, and afterwards delivered to Francis Preston, brother to and one of the bondsmen of John Preston, and by him sent away to be recorded in several distant counties where portions of the lands conveyed were situated. On the seventeenth day

of August, 1818, Preston, the treasurer, received from the United States a draft on the Bank of the United States at Philadelphia for $146,500, which he converted to his own use. After his re-election and giving of the bond sued on, he conveyed all of his property, as above stated, to his bondsmen, in view of and to indemnify them against his impending defalcation, caused by the conversion of the said draft.

Before the commencement of the trial the plaintiff notified Francis Preston, one of the bondsmen, to produce the original deed at the trial, and offered, if necessary, to postpone the trial to enable him to produce it. The original deed not being produced, the plaintiff offered in evidence a copy from the record certified by the clerk of the hustings court, where the same was recorded, and also proved that the original deed was, about eight months before the trial, delivered by the clerk of said court to the said Francis Preston; and proved by the oath of said clerk that the same was a correct copy, and that the trustees under the said deed, and one of the defendants, had acted under the said deed, by authorizing and effecting sales of property therein specified, etc., whereupon the said copy was excluded from going in evidence to the jury. The plaintiff offered and gave in evidence the several reports made by the said John Preston to the two houses of the legislature, from the —— day of January, 1809, to the thirteenth day of January, 1819, inclusive, and the annual reports of the joint committees of both houses of the assembly, from the said —— day of January, 1809, to the said thirteenth day of January, 1819, exclusive; and the books of the treasury department, during the whole period during which John Preston was treasurer of the commonwealth, by virtue of his successive annual elections aforesaid. And according to said annual reports and the said books of the treasury department, it appeared that on first of October, 1818 (being the end of that fiscal year),

there ought to have been a balance in the treasury of $390,702.95, and on the eighteenth day of January, 1819, being the date of the bond sued on, and the day of the commencement of John Preston's last term of office, there ought to have been a balance in the treasury of $648,412.23, and on the seventeenth day of January, 1820, when the said John Preston resigned his said office, there ought to have been a balance in the treasury of $333,297.07. But the plaintiff proved that on the said seventeenth day of January, 1820, there was but $250,197.77, so that there was a difference and defalcation of $83,099.30.

The defendants proved the receipt by the said John Preston on the seventeenth day of August, 1818, from the United States of the said sum of $146,500, "which sum    *    *    *    was passed by the said John Preston on the same day to the credit of the commonwealth, on the books of the treasury department, but the said John Preston on the same day did not deposit the same at the bank to his credit as treasurer, on official account, but did deposit the same to his own individual credit at the Bank of Virginia on his individual private account, blending the same with his private funds at his credit at said bank," etc.

Under the rulings and instructions of the court the jury found in favor of the sureties, and only *one cent damages against Preston himself.*

Under the practice of that early day a special court of appeals was summoned to try the case on error. Judge Roane delivered the opinion of the court, and after finding error in the action of the general court in excluding the copy of the deed from the jury as evidence that the bondsmen had received the conveyance of property and accepted the same as an indemnity against loss by reason of the defalcation then in suit, and deciding to grant a new trial on account of such error, he proceeds to discuss the other question, and laid down the law as hereinbefore stated.

It is quite obvious that all the equities of this case were with the plaintiff. The state treasurer being without a bond or sureties had misappropriated a large sum of public money and invested it in real estate. He afterwards gave a bond, with his brother and others as his securities. Being about to go out of office a defaulter, he conveyed through trustees to his bondsmen all of his property, including, doubtless, the identical property bought with the state's money, to indemnify them against loss by reason of his said defalcation. His actual defalcation amounted to over eighty-three thousand dollars, at that time an enormous sum of money, and the jury, under the instructions of the general court, had found for the defendants. The court of appeals most undoubtedly did right in granting a new trial for error of the general court in ruling out the record of the deed of trust. That was all that was necessary in the case. The deed once in evidence, together with evidence of its acceptance by the bondsmen, which was proved on the trial, would have been sufficient to estop the sureties to deny their liability on the bond, the default under their bond being recited as the consideration in the deed, so that I think all else in the opinion but *obiter dicta*.

The Indiana and Illinois cases cited by counsel for defendant in error, but follow *Baker v. Preston, supra*.

On the other hand, in the case of *Inhabitants of Rochester v. Randall*, 105 Mass., 295, the supreme court of Massachusetts held (I quote syllabus): " The same person was chosen treasurer of a town five consecutive years. In the first four he served without a bond, and in the fifth he gave a bond conditioned that whereas he had been chosen to the office for that year, if he should well and faithfully perform all of the duties of his said office, the bond should be void. *Held*, That the sureties were not liable for his appropriation to his own use during the first year of money of the town which he falsely credited himself in his account of that year as having been

officially disbursed by him, and never entered on his subsequent account."

I also quote from the opinion: "But it is obvious that the misappropriation of the money was complete in 1862, and that if the town had taken a bond for that year the defalcation would have been covered by it. There is no evidence that the specific money remained in his hands after the close of that year. He did not account for it in 1863, and was not required to do so. The same is true as to the next two years. The town has always objected to the entry in his account, which implies that it was known to them; but its claim to the money has not been enforced prior to his procurement of securities in 1866. But the cause of action against him arose in 1862 when he rendered his account, and the town is entitled to recover interest against him from the time of the misappropriation. We cannot regard the defendants' bond as applying to it."

This case, although it does not mention, in effect overrules *Sandwich v. Fish and others*, 2 Gray, 298, cited by counsel of defendants in error, in which the same court held that, "where a town yearly for four successive years charges a collector of taxes in account with the amount of taxes entrusted to him for collection, and with the balance of the previous year's account, and credits him with the money received from him, and with the balance carried to the next year's account, and no other appropriation of the sums paid by him is made by either party, they will be applied to the extinguishment of the earliest charges and the balance of each year's account except the last; being thus extinguished the town may recover the final balance of him and his sureties in an action on his bond for the fourth year."

The old supreme court of the state of New York certainly did not regard a settlement between a county treasurer and the county board as being beyond the reach of reinvestigation. The case of *Supervisors of Chenango v.*

*Birdsall and others,* 4 Wend., 453, was an action brought in 1828 by the board of supervisors against a former county treasurer and his bondsmen, on their bond executed in October, 1812, for interest claimed to be due on certain moneys held by said treasurer, and which it was claimed had been wrongfully remitted to him by a former board. In the opinion the court, by MARCY, J., say: "There was an error in the calculation of the commissioners, and although plaintiffs might have discovered it by a careful examination of the accounts, yet it does not appear that it was known to them. I do not believe that because they passed these accounts without debiting the error, having the means to do so, they are precluded from setting the matter right when the mistake is discovered. The plaintiffs, acting as public agents in the settlement of the accounts of the defendant, Birdsall, also a public agent, in whom they had full confidence, and who knew better than they possibly could the state of the accounts, ought not to be held to the same strictness applied to individuals in the settlement of accounts relating to their private affairs."

The case of *Bissell v. Saxton,* 66 N. Y., 557, decided by the present court of appeals, is squarely with the plaintiffs in error. I quote from the syllabus: "The sureties upon the bond of a public officer are liable thereon only for the defaults of their principal committed after the commencement of the term of office for which they became his sureties. Although their principal held the office for a preceding term, they are not liable for a defalcation which then occurred. In such case, those who were sureties for the officer for the prior term must be looked to. In an action upon a bond of an officer his official reports are not conclusive as against his sureties, but mere admissions of the principal, subject to explanation." The judgment, which was for the plaintiff, was reversed.

The case of *Supervisors of Jefferson County v. Jones et al.,* 19 Wis., 51, cited by counsel for plaintiffs in error, came

before the supreme court on a question quite like that involved in this case. Jones being county treasurer, made a settlement in full, as was claimed and supposed, with the board of county supervisors. Afterwards it was discovered that a mistake had been made in such settlement, and that there were several specified sums justly chargeable to him, but with which he was not charged in such settlement, etc. Suit was brought for these sums against Jones and his bondsmen. On demurrer to the petition, which was sustained, and error, the supreme court, per DIXON, C. J., held that such settlement could be opened. I quote from the opinion: "The facts are fully sufficient to authorize a recovery, unless the plaintiff is precluded from taking advantage of the alleged mistakes upon which the action proceeds. This seems to be the substance of the objections principally urged in support of the demurrer. In transactions between individuals there can be no doubt that the injured party would have his remedy in such case. The settlement or account stated would be only *prima facie* evidence of its correctness. No reason is perceived why the accounts of public officers should be excluded from the operation of the same rule. Indeed it has been held that the same strictness is not applied to public officers as is applied to individuals; and that a mistake in a settlement between them will be allowed to be rectified which would not be allowed as between individuals." Citing, with approval, *Supervisors of Chenango v. Birdsall, supra.*

The case of *Vivian, Treasurer, etc., v. Otis and others*, 24 Wis., 518, also cited by counsel for plaintiffs in error, is quite in point. Otis was clerk of the board of supervisors, an office answering pretty much to our county clerk. Under their system this officer has the custody of certain public moneys, called redemption money, for which he is required to give bond. Otis was elected his own successor. He gave a bond for each term, an entirely different set of securities going on his last one. At the close of his second

term he proved a defaulter. A suit was brought against him and his sureties on the second bond. The amount of his defalcation was $3,571.97. Judgment was rendered against him and his said second sureties for only $1,412. The county appealed to the supreme court. I quote from the opinion of the court by COLE, J., the present chief justice: "On the trial Otis was sworn as a witness on behalf of the defendants, and was allowed to testify, against the objection of the plaintiff, that when he made his settlement with the board in January, 1867, instead of having in his hands the sum he reported and charged himself with at the time, he in fact had only $950 or $960. There is no controversy but that the sum of $3,571.97 is due the county from Otis, and the only question is whether the sureties on the second bond are liable for the whole deficiency.

On the part of the county it is claimed that under the circumstances the sureties on the second bond are liable for this entire amount; that as the law required the clerk to pay over to his successor in office all redemption money in his hands, and as he was his own successor, to whom he was to pay over, the sureties on the second bond became responsible for his receiving from himself the accumulated receipts of the former term and for his having in his possession the amount by him reported as in his hands, as well as for the faithful disbursement of that amount during his second term. The court below negatived this view of the liability of the sureties upon the second bond, in effect holding in the various instructions given the jury that the sureties upon that bond were only responsible for the amount of defalcation occurring during the term for which they became surety; that while the settlement made by Otis at the end of his first term showed that he was then owing the county the sum of $3,119.97, yet the sureties might reduce that amount by showing that Otis was a defaulter at that time and had appropriated and converted a portion of that sum to his own use, and that whatever sum he had thus

appropriated and converted should be subtracted from the amount for which they were sued. It appears to us that this was a correct statement of the principles of law applicable to the facts of the case. * * * The sureties on the second bond became liable for the faithful performance of the duties of the office by their principal for the second term, and that he would pay over all moneys remaining in his hands when the bond was executed, or which might come into his hands. So far the court below held them answerable, and a recovery has been had for a breach of that duty. If Otis had not the money in his hands which he reported January 7, 1867, it was because he had previously misapplied it in violation of his duty as clerk. And the question is: Shall the sureties on this bond be held liable for defaults which occurred in the former term? Or must the sureties in the different bonds be responsible for the misconduct and defalcation for each period for which they obligated themselves? It is a familiar principle 'that the obligation of a surety is a matter of strict law, and can never arise by implication. The bond must speak for itself, and its language can never be extended or altered to the injury of the surety.' * * * It would be a violation of this elementary principle to hold the sureties on the last bond liable for the defaults of the first as well as the second term." The judgment was affirmed. In other and later cases before the same court the law of this case has been adhered to.

The supreme court of Nevada decided the same point in the same way in *State v. Rhoades,* 6 Nev., 352. This was an action on the second bond of a deceased state treasurer, who had been elected his own successor. I quote from the syllabus: "On a trial against the sureties on the official bond of a state treasurer to recover for defalcation claimed to have taken place within the period covered by the instrument, it is competent for the defendant to show that the defalcation occurred previous to the giving of the bond,

and any testimony tending to support such defense is relevant and pertinent. Where, in an action against the sureties on the official bond of a state treasurer for defalcation, defendant's counsel asked a witness as to the condition of the treasury at a time previous to that covered by the bond, and upon objection, on the ground of irrelevancy, counsel stated that he proposed to show that the defalcation complained of took place before the bond was given, and that to show such fact it was necessary to show the condition of the treasury as asked, *Held,* That the exclusion of the question and proposed testimony was error."

The Iowa, Michigan, Missouri, New Jersey, and United States circuit court cases cited by counsel for plaintiffs in error, as well as the late case of *Thomas v. Blake,* 126 Mass. R., 320, and many cases in the supreme court of the United States; *Miller v. Stewart,* 9 Wheat., 680; *Farrar v. U. S.,* 5 Pet., 373; *U. S. v. Boyd,* 15 Pet., 187; *U. S. v. Linn,* 1 How., 104; and *Bruce v. U. S.,* 17 How., 437, all hold the same way.

I close the citation of authorities by quoting from a recent text-book: "The general rule, that the liability of a surety is measured by the terms of his contract, applies in its full force to contracts of suretyship entered into in the form of official bonds. It is a clear proposition on principle and authority that the sureties on the bond of a public officer, are liable only for defaults committed by him after the commencement of the term of office for which they become his sureties, and that if it should so happen that the same individual had previously held the same office under a prior appointment, and had committed defaults during the term of that appointment, those who were his sureties on such prior appointment must be looked to for such defaults, and not those who signed his bond on his re-appointment. Their engagement is for his future, and not his past conduct; and it would be a gross imposition upon them, in the absence of a special stipulation to that

effect, to impart into their undertaking responsibility for prior delinquencies. Baylees on Sureties and Guarantors, p. 150, sec. 9.

In the case at bar, the date of Van Sickel's defalcation is the central fact upon which the liability of the plaintiffs in error turns. Why could it not be proved the same as any other fact? Under the law as it now stands here, and in all the code states, no witness is excluded on account of his interest in the result of the trial. But were this not so, Van Sickel had no legal interest in the result. He had suffered default, and in any event judgment must go against him. He had not been convicted, or even indicted, so far as we know, for the embezzlement of this money. There was then no legal objection to the testimony, or to the person offered as a witness.

I therefore reach the conclusion that in giving the instruction set out at the commencement of this opinion and others of like tenor, as well as in refusing to give instruction No. 1, as prayed by counsel for plaintiffs in error; also, in refusing to allow plaintiffs in error to prove, on the trial, that the defalcation of Van Sickel, for which they were sued, was committed within a prior term, and before they became his sureties, the district court erred.

There are other and technical reasons why the said judgment cannot stand. The principal defendant, Van Sickel, made default; his default was entered, but no judgment is rendered against him. In any event, the sureties have a right to insist that judgment shall go against their principal, if living, as soon as it goes against them.

Again, Lewis H. Cramer and Charles Yoder seem to have been dropped out of the case without any explanation, probably by mistake of the clerk of the district court, and a general judgment is rendered against George Meisner as administrator of Casper Meisner, deceased.

The judgment of the district court is reversed, and the

cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.